UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DFO GLOBAL PERFORMANCE
COMMERCE LIMITED (NEVADA), *et
al.*,
                    Plaintiffs,

                    -v-

KRISHNA DELAHUNTY NIRMEL, *et
al.*,
                    Defendants.

20-CV-6093 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiffs DFO Global Performance Commerce Limited (Nevada) ("DFO USA"), DFO

Global Performance Commerce Limited (Canada) ("DFO Canada"), Verve Direct Limited

("Verve"), and Make Great Sales Limited ("MGS") bring this misappropriation and trademark

action against Defendant Krishna Delahunty Nirmel, DFO USA's former employee and

Plaintiffs' former Chief Revenue Officer ("CRO"), and his supposed affiliates, Defendants Flynn

Stevens, Daniel Hughes, the Real Steve Life, Inc. ("Real Steve"), and Scented Geranium Ltd.

(Dkt. No. 36.)  In brief, Plaintiffs allege that Nirmel led a scheme to funnel non-public

information about Plaintiffs' businesses to Stevens and Hughes.  Plaintiffs further allege that

Stevens and Hughes, in turn, used the non-public information to sell products that replicate or

compete with Plaintiffs' products.  Based on this conduct, Plaintiffs claim that Defendants

violated the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, misappropriated confidential

information, tortiously interfered with contracts, were unjustly enriched, and were engaged in an

unlawful civil conspiracy.  Plaintiffs additionally claim that Nirmel breached a confidentiality

agreement, that Nirmel breached his fiduciary duties, that Stevens and Hughes aided and abetted

1

Nirmel's fiduciary breach, and that Stevens and Hughes violated the Lanham Act and its state analogue.

On November 23, 2020, Nirmel filed a motion to dismiss all of the claims against him. (Dkt. No. 42.)  Separately, Stevens, Hughes, Real Steve, and Scented Geranium (together, "S/H Defendants") filed a motion to dismiss all of the claims against them.  (Dkt. No. 39.)  For the reasons that follow, both motions to dismiss are granted in part and denied in part.

## I.     Background

### A.     Plaintiffs' Business

The following facts are taken from the amended complaint and are assumed true for purposes of this motion.

Plaintiffs are e-commerce companies that market and sell "novelty products" on their own behalf and on behalf of third-party merchants.  (Dkt. No. 36 ¶¶ 24–25.)  In support of their respective businesses, Plaintiffs have developed pricing strategies, marketing strategies, methods and tools for creating marketing materials, algorithms for evaluating marketing programs, and a network of vendors and marketing affiliates.  (Dkt. No. 36 ¶¶ 26–29.)  Plaintiffs have also, through their "back office tracking and monitoring systems for the sales generated over the internet," accumulated data on product sales, profit margins, and inventory.  (Dkt. No. 36 ¶ 31.)  From their "voluminous data," Plaintiffs can determine which products are most successful and how quickly products sell.  (Dkt. No. 36 ¶¶ 34–36.)  Plaintiffs can then select products to sell and order enough of each to meet, but not exceed, demand.  (Dkt. No. 36 ¶¶ 34–36.)  Altogether, Plaintiffs' strategies and accumulated data permit them to "maximize consumer purchases" and distinguish themselves from competitors.  (Dkt. No. 36 ¶¶ 29, 36.)

Plaintiffs store and gather their strategies and data on systems that require either a password or appropriate credentials to access.  (Dkt. No. 36 ¶¶ 40, 61.)  Nirmel, when he was

2

CRO and an employee of DFO USA, had "full access" to Plaintiffs' systems and most highly protected information, including information on Plaintiffs' pipeline of new products.  (Dkt. No. 36 ¶¶ 32, 37.)  Lower-level employees and marketing affiliates have more limited access to Plaintiffs' systems; notionally, these employees and marketing affiliates have access to a system only to the extent that such access is warranted by "legitimate business purposes."  (Dkt. No. 36 ¶¶ 31, 61–62.)

Consistent with Plaintiffs' protection of their strategies and data, Plaintiffs' employees are advised that they must keep this information confidential.  (Dkt. No. 36 ¶ 41.)  Plaintiffs often have their employees sign confidentiality agreements, and Plaintiffs append to their pleadings a Confidentiality and Nondisclosure Agreement that Nirmel and DFO Canada executed on September 5, 2019, before Nirmel attended a product development summit in Vietnam.  (Dkt. No. 36 ¶¶ 41, 57; Dkt. No. 36-1.)  Similarly, Plaintiffs' marketing affiliates enter into agreements ("Marketing Affiliate Agreements") that obligate them to "maintain the confidentiality of all confidential information including consumer lists, [sales] volume data, product information etc. that [they have] access to for monitoring [their] account[s]."  (Dkt. No. 36 ¶ 30.)

Plaintiffs impose these confidentiality rules because their strategies and data "have been compiled with considerable expense through years of effort" and because they believe that this information could provide "a road map for a competitor to pirate Plaintiffs' most successful offerings."  (Dkt. No. 36 ¶¶ 34–35.)

### B.   The Scheme to Transmit Confidential Information

Plaintiffs allege that in September 2019, Nirmel began working with an Affiliate Manager at DFO Canada ("Employee A") and one of Plaintiffs' employees in Hong Kong ("Employee B") to supply Stevens and Hughes with Plaintiffs' confidential information.  (Dkt.

No. 36 ¶¶ 59–60.)  This was a covert and roundabout operation:  Employee B, who did not have access to certain systems, used Employee A's credentials or computer to enter those systems and obtain sales data.  (Dkt. No. 36 ¶¶ 61, 65.)  Employee A supplemented the information that Employee B gleaned from the systems with verbally conveyed information.  (Dkt. No. 36 ¶ 67.)  Employee B then transmitted what he had gathered to Stevens and Hughes.  (Dkt. No. 36 ¶¶ 64, 67.)  Employee B was, in his own words, a "super spy."  (Dkt. No. 36 ¶ 66.)

Nirmel, too, provided Stevens and Hughes with information.  (Dkt. No. 36 ¶¶ 74–76.)  Plaintiffs allege that Nirmel directly informed Stevens and Hughes about products in Plaintiffs' pipeline that were not yet on the market and provided Stevens and Hughes with Plaintiffs' vendor information.  (*Id*.)  Plaintiffs further allege that Nirmel used Plaintiffs' confidential information to assist Stevens and Hughes in developing their own product advertisements, to compete with Plaintiffs' advertisements.  (Dkt. No. 36 ¶ 77.)

Nirmel's role in the alleged scheme was not limited to transmitting information and assistance to Stevens and Hughes.  Plaintiffs identify an instance in June 2020 in which Nirmel organized a call with Employee B and Stevens to discuss their efforts.  (Dkt. No. 36 ¶ 70.)  Plaintiffs also allege that Nirmel used his authority to shield Employees A and B from scrutiny.  In December 2019, DFO Canada's leadership discovered that Employee B had been accessing Plaintiffs' systems through Employee A's account.  (Dkt. No. 36 ¶ 61.)  Nirmel intervened, saying that Employee B had in fact been using the account in support of Plaintiffs' business activities.  (Dkt. No. 36 ¶ 62.)  As a result, neither Employee A nor Employee B faced serious discipline or further investigation.  (Dkt. No. 36 ¶ 63.)  Additionally, Plaintiffs allege that Nirmel took steps to undermine Plaintiffs' business, and to better position Stevens and Hughes as

competitors, by intentionally over-ordering products on behalf of Plaintiffs.  (Dkt. No. 36 ¶¶ 87, 106–108.)

On July 31, 2020, Nirmel left DFO USA.  (Dkt. No. 36 ¶ 48.)  Nirmel's scheme had operated for more than half a year.  Throughout this period, Stevens and Hughes paid Employee B through Real Steve.  (Dkt. No. 36 ¶ 96.)

### C.    The Competitor Products

Like Plaintiffs, Stevens and Hughes engage in e-commerce, marketing and selling novelty products.  (Dkt. No. 36 ¶ 88.)  They operate Real Steve and Scented Geranium to direct internet traffic to their products and to process payments from the sale of their products.  (Dkt. No. 36 ¶¶ 92–95.)  Plaintiffs contend that Stevens and Hughes, as well as their businesses, were involved in and directedly benefited from Nirmel's scheme to transmit Plaintiffs' confidential information.

To elaborate, Plaintiffs allege that Stevens and Hughes used Plaintiffs' confidential information to "cherry pick[]" the most profitable of Plaintiffs' offerings and begin selling "the same or similar/knock off products."  (Dkt. No. 36 ¶ 78.)  In particular, Stevens and Hughes procured and sold "replica[s]" of Plaintiffs' "Mobile Klean" UV wand and "Breathe Clean" air freshener.  (Dkt. No. 36 ¶¶ 99–102.)  These products were sold on the following webpages, controlled by Stevens and Hughes: https://www.boomwand.com/v1b, http://freshcoalbags.com/, and http://freshcoalbags.com/checkout.php.  (*Id*.)  Stevens and Hughes also procured and sold a "product to compete" with Plaintiffs' "Blaux" portable air conditioner.  (*Id*.)  This product was sold on their webpages https://www.shopezcoolbreeze.com/checkout.php and https://www.shopezcoolbreeze.com/.  (*Id*.)  Plaintiffs allege that the products sold by Stevens and Hughes were "not of the same quality" as Plaintiffs' products.  (Dkt. No. 36 ¶ 105.)

Stevens and Hughes copied not only Plaintiffs' inventory but also Plaintiffs' product advertising, images, and tag lines.  (Dkt. No. 36 ¶¶ 77–78.)  Plaintiffs allege that Stevens and Hughes purchased Plaintiffs' "terms and product names," including the Blaux brandname, on Google and Facebook, such that products marketed by Stevens and Hughes would pop up when a prospective customer searched for Plaintiffs' brands.  (Dkt. No. 36 ¶¶ 79–84.)  Plaintiffs further allege that Stevens and Hughes created the following webpages using the Blaux brandname: https://getblaux.com, https://getblaux.site/products/blaux?desktop, https://buyblaux.click/products/ezcool?desktop, and https://getblaux.site/.  (Dkt. No. 36 ¶¶ 99, 104.)  In the same vein, Plaintiffs allege that "Real Steve paid companies . . . for traffic directed away from Plaintiffs' offers to offers created or controlled by Stevens and Hughes."  (Dkt. No. 36 ¶ 92.)

### D.    Procedural History

Plaintiffs filed this case on August 4, 2020.  (Dkt. No. 1.)  In October 2020, Nirmel and the S/H Defendants moved to dismiss the original complaint.  (Dkt. No. 30; Dkt. No. 33.)  In response, Plaintiffs filed an amended complaint.[1]  (Dkt. No. 36.)  Nirmel and the S/H Defendants then moved to dismiss the amended complaint.[2]  (Dkt. No. 39; Dkt. No. 42.)

---

[1] Plaintiffs' amended complaint mooted Nirmel's and the S/H Defendants' October 2020 motions to dismiss.  The motions are denied accordingly.

[2] In opposing the motions to dismiss, Plaintiffs filed a declaration and five exhibits from an employee at a non-party company that works in internet marketing.  (Dkt. No. 49.)  Plaintiffs, however, "may not shore up [their] complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss."  *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 122–23 (S.D.N.Y. 2010).  The vast majority of Plaintiffs' belated submission is in fact extrinsic to the complaint, neither quoted nor referenced in any of the pleadings.  The Court therefore declines to consider the declaration, the exhibits, and any cites thereto in Plaintiffs' papers opposing the motions to dismiss.  *See* Fed. R. Civ. P. 12(d).

II.     **Legal Standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In considering the motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002).  And while "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, the Court must draw "all inferences in the light most favorable to the nonmoving party[]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

III.    **Discussion**

Defendants challenge all of the claims against them under Federal Rule of Civil Procedure 12(b)(6).  The Court first addresses the claims relating to Defendants' alleged scheme to misappropriate Plaintiffs' trade secrets and confidential information.  It then addresses the trademark and unfair competition claims against Stevens and Hughes.

A.      **The Misappropriation Scheme**

1.      **The Defend Trade Secrets Act and Common Law Misappropriation Claims**

The Defend Trade Secrets Act ("DTSA") establishes a federal cause of action for the misappropriation of trade secrets.  *See Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 510 (S.D.N.Y. 2017).  Both Nirmel and the S/H Defendants challenge whether Plaintiffs have pleaded any trade secret, at least with sufficient specificity.  Nirmel and the S/H Defendants also attempt to distance themselves from any potential misappropriation, arguing that Plaintiffs have

failed to plead their knowing participation in a scheme to transmit or obtain trade secrets. Neither of Defendants' arguments is persuasive.

The DTSA sets forth a broad definition of "trade secret" that encompasses "all forms and types of financial, business, technical, or engineering information . . . whether tangible or intangible, and whether or how stored," so long as (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known[] and not being readily ascertainable." 18 U.S.C. § 1839(3). To be sure, trade secrets constitute a mere subset of a business's confidential information, *Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-cv-5540, 2018 WL 557906, at *4 (S.D.N.Y. Jan. 23, 2018), but the question of whether information rises to the level of trade secret, based on its value and ascertainability, is "generally a question of fact[] that is not easily resolved at the motion to dismiss stage," *ExpertConnect, L.L.C. v. Fowler*, No. 18-cv-4828, 2019 WL 3004161, at *5 (S.D.N.Y. July 10, 2019) (internal quotation marks and citation omitted).

At the pleading stage, a plaintiff must do little more than "describe the [trade] secret with sufficient specificity that its protectability can be assessed." *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05-cv-9292, 2008 WL 463884, at *10 (S.D.N.Y. Feb 20, 2008). To that end, the plaintiff should include allegations regarding the information's value and the ease with which the information can be acquired. *Elsevier*, 2018 WL 557906, at *6; *see also Zirvi v. Flatley*, 433 F. Supp. 3d 448, 465 (S.D.N.Y. 2020). But the plaintiff need not identify the "precise trade secrets," *Medtech Products Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 789 (S.D.N.Y. 2008), or otherwise "reveal those secrets in the Complaint simply to prove that they exist," *SD Protection, Inc. v. Del Rio*, 498 F. Supp. 2d 576, 586 (E.D.N.Y. 2007). Indeed, the complaint may describe

trade secrets in broad terms or list categories of information, *see Zabit v. Brandometry, LLC*, No. 20-cv-555, 2021 WL 1987007, at *8 (S.D.N.Y. May 18, 2021); *Ranir*, 596 F. Supp. 2d at 789, so long as the alleged secrets are not "extraordinarily general," to the effect of "interpretation of data" or "methods relating to executing projects and related protocols and information." *Elsevier*, 2018 WL 557906, at *5.

Here, Plaintiffs allege that Nirmel, and Employees A and B at his direction, disclosed the products in Plaintiffs' pipeline, Plaintiffs' vendor information, and the sales volume and profitability of Plaintiffs' offerings, including the Mobile Klean and Blaux products. Information to this effect has previously been treated as a trade secret by courts in the Second Circuit. *See, e.g., Kraus USA, Inc. v. Magarik*, No. 17-cv-6541, 2020 WL 2415670, at *5 (S.D.N.Y. May 12, 2020) (holding that "information on upcoming designs, sales data, e-commerce data, and other commercially sensitive information including . . . vendor relationships" constituted protectable trade secrets); *Data Device Corp. v. W.G. Holt, Inc.*, No. 19-cv-4105, 2020 WL 7024312, at *2–3 (E.D.N.Y. Nov. 30, 2020) (treating "accumulated sales data such as purchasing histories and pricing information" as a trade secret); *see also Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1176–77 (2d Cir. 1993), *abrogated on other grounds*, *Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368 (2d Cir. 2000) ("Compilations of information, traditionally viewed and protected under trade secret law, are items like . . . pricing and cost information."). Moreover, Plaintiffs explain that they developed this information through years of collecting and analyzing data. *See Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (considering "the amount of effort or money expended by the business in developing the information" as a "guidepost[]" for identifying trade secrets (internal quotation marks and citations omitted)). They explain the

ways in which they protected this information from outsiders, as well as from their own employees who were not using the information for legitimate business purposes.  *Id*. (same for "the extent of measures taken by the business to guard the secrecy of the information" (citation omitted)).  Finally, they present a persuasive theory for how the information is more valuable when secret:  A competitor with access to the information could bypass an expensive trial-and-error process to determine which products to stock, what pricing schemes to use, and how many units to order, from whom.  Plaintiffs have pleaded their trade secrets with the requisite degree of specificity.

Plaintiffs have also pleaded misappropriation, notwithstanding Defendants' thin arguments to the contrary.  The S/H Defendants, for instance, argue that "[t]here are no facts alleged connecting even Nirmel, let alone the S/H Defendants, to the conduct of [Employees A and B]."  (Dkt. No. 40 at 17.)  But this simply is not true.  Plaintiffs contend that Nirmel, Stevens, and Employee B met to coordinate.  The complaint even quotes a message from Employee B in which he discusses meeting with Nirmel and Stevens.  The complaint goes on to specify that Real Steve paid Employee B.  Setting aside the allegations regarding Employees A and B, Plaintiffs contend that Nirmel conveyed information directly to Stevens and Hughes.  And, despite the S/H Defendants' urging, the Court sees no reason to believe that the S/H Defendants lacked knowledge of the improper means used to acquire and transmit the information.  *See* 18 U.S.C. § 1839(5) (defining "misappropriation" as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means").  Surely they could not have thought that Plaintiffs were voluntarily sharing their trade secrets through the backchannel of "super spy" Employee B.

Plaintiffs have plausibly pleaded the misappropriation of trade secrets and thus their DTSA claim.  Having decided this, the Court necessarily concludes that Plaintiffs state a common law claim for the misappropriation of confidential information.[3]  *See Kraus USA*, 2020 WL 2415670, at *5 ("If a complaint sufficiently alleges a claim under the DTSA, it also sufficiently pleads misappropriation . . . under New York law.").  The DTSA and common law misappropriation claims may proceed to discovery.

### 2.    The Tortious Interference Claims

Plaintiffs assert that, in misappropriating their confidential information, Defendants tortiously interfered with the Marketing Affiliate Agreements.  These claims are insufficiently pleaded.  *Cf. RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 405 (S.D.N.Y. 2009) ("The law requires some factual specificity in pleading tortious interference." (citation omitted)).

As Nirmel and the S/H Defendants point out, the complaint identifies neither the contracting parties nor the contracts.  Instead, the complaint gestures to "written agreements" entered into by unspecified "Verve Marketing Affiliates."  (Dkt. No. 36 ¶ 30.)  The complaint lists a series of obligations that the marketing affiliates supposedly have, but it is unclear whether the list reflects actual contract language or Plaintiffs' interpretation thereof and whether these supposed obligations appear in some or all of the Marketing Affiliate Agreements.  (*Id.*)  Plaintiffs' lack of specificity is fatal to their claims.  *See Plasticware, LLC v. Flint Hills Resources, LP*, 852 F. Supp. 2d 398, 404 (S.D.N.Y. 2012) ("Plaintiff has not plausibly alleged adequate details about a specific contract between itself and a third party, but merely has alleged

---

[3] Nirmel argues that the common law misappropriation claim against him fails as duplicative of Plaintiffs' breach of contract claim.  As discussed *infra* (in the context of the fiduciary breach claim), the breach of contract claim is plausibly more circumscribed than the other claims relating to the misappropriation scheme.  Nirmel's argument is thus unpersuasive.

that it has 'agreements' with [third-parties].  This is insufficient."); *Amtrust N. Am., Inc. v.

*Safebuilt Ins. Servs., Inc.*, No. 14-cv-9494, 2015 WL 7769688, at *8 (S.D.N.Y. Dec. 1, 2015)

("[The] claims suffer from exactly the same defect, in that they provide virtually no information

about the contracts with which [the defendants] allegedly interfered."); *see also Katz v.

Travelers*, 241 F. Supp. 3d 397, 408 (E.D.N.Y. 2017) ("[F]ailure to identify specific entities with

which the Plaintiffs had contracts is fatal to [a] tortious interference with a contract cause of

action.").  Plaintiffs' tortious interference with contract claims are dismissed.

### 3.   The Unjust Enrichment Claims

Plaintiffs also claim that Defendants were unjustly enriched by the misappropriation

scheme.  As Defendants argue, Plaintiffs' unjust enrichment claims fail as duplicative of the

DTSA and common law misappropriation claims.

It is well established that an unjust enrichment claim "is not available where it simply

duplicates, or replaces, a conventional contract or tort claim."  *Corsello v. Verizon N.Y., Inc.*, 18

N.Y.3d 777, 790 (2012); *see also Shaw v. Empire Stock Transfer Inc.*, 381 F. Supp. 3d 286, 292

(S.D.N.Y. 2019) ("This [unjust enrichment] claim is unnecessarily duplicative of any claims

arising in tort, contract, or under the statute.").  At least one court, affirmed by the Second

Circuit, has held that an "unjust enrichment theory [cannot be pleaded] in terms that restate[]

other torts, specifically . . . trade secret misappropriation."  *Continental Indus. Grp., Inc. v.

Altunkilic*, No. 14-cv-790, 2018 WL 1508566, at *9 (S.D.N.Y. Mar. 27, 2018), *aff'd in relevant

part, vacated in part on other grounds*, 788 F. App'x 37 (2d Cir. 2019); *accord Continental

Indus. Grp., Inc.*, 788 F. App'x at 43 ("[The] claims for unjust enrichment . . . merely duplicate

[the] other claims and, accordingly, should be dismissed.").  That holding is directly applicable

here.

Although Plaintiffs construe their DTSA and common law misappropriation claims more narrowly than their unjust enrichment claims for the purposes of the present motion — suggesting that the former are "merely [about] the improper access of confidential trade secrets" and not about Defendants' subsequent profiteering (Dkt. No. 48 at 23) — Plaintiffs' position is belied by the complaint.  With respect to the DTSA claims, Plaintiffs allege that "Defendants have wrongfully . . . used Plaintiffs' Trade Secrets . . . for Defendants['] own benefit."  (Dkt. No. 36 ¶ 142.)  And with respect to their common law misappropriation claims, Plaintiffs allege that "Defendants gained a financial benefit for themselves."  (Dkt. No. 36 ¶ 173.)  These pleadings are not just for show.  The DTSA permits plaintiffs to seek damages not only for "actual loss caused by the misappropriation of the trade secret" but also for "any *unjust enrichment* caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss."  18 U.S.C. § 1836(b)(3)(B)(i) (emphasis added).  The same is true of common law misappropriation.  *See LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 185 (S.D.N.Y. 2002) ("[D]amages may be measured by the defendant's unjust enrichment as a result of the misappropriation.  Unjust enrichment is measured by the profits the defendant obtained from using the [misappropriated information].").

Plaintiffs evidently drafted their complaint in contemplation of seeking unjust enrichment damages on their DTSA and common law misappropriation claims.  They cannot now argue that these claims differ in any material way from their claims brought under the unjust enrichment cause of action.  The unjust enrichment claims are dismissed.

### 4.     The Civil Conspiracy Claims

Plaintiffs assert one last cause of action against all Defendants: civil conspiracy.  But "[i]t is a well-settled and often repeated principle of New York law that no cause of action lies for civil conspiracy."  *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 591 (2d

Cir. 2005).  Instead, civil conspiracy is a mere "theory under which a party can establish the

vicarious liability of co-conspirators for each others' offenses."  *Marino v. Grupo Mundial*

*Tenedora, S.A.*, 810 F. Supp. 2d 601, 610 (S.D.N.Y. 2011).  A plaintiff may not "reallege a tort

asserted elsewhere in the complaint in the guise of a separate conspiracy claim."  *Aetna Cas. &*

*Sur. Co.*, 404 F.3d at 591; *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 251

(2d Cir. 1985) ("Count 7 [civil conspiracy] was properly dismissed, either as duplicative of

counts 1–6, or as failing to state a claim on which relief may be granted since New York law

does not recognize a substantive tort of conspiracy" (citations omitted)); *accord Am. Baptist*

*Churches of Metro. New York v. Galloway*, 710 N.Y.S.2d 12, 18 (1st Dep't 2000) ("While in

New York there is no separate tort of conspiracy, allegations of conspiracy are permitted to

connect the actions of separate defendants with an otherwise actionable tort.  Here, [the

plaintiff's] other claims have already pleaded these torts and defendants' alleged collusion to

commit them." (internal quotation marks and citation omitted)).  As Defendants argue, and

Plaintiffs do not meaningfully dispute, Plaintiffs have attempted to relabel their misappropriation

claims as civil conspiracy claims.  This they cannot do.  Their conspiracy claims are dismissed.

## 5.   Breach of Contract Claim

Plaintiffs claim that Nirmel violated paragraphs 1 and 2 of the Confidentiality and

Nondisclosure Agreement that he signed in advance of a 2019 product development summit in

Vietnam.  (Dkt. No. 36 ¶ 204.)  The contract provisions, which are appended to the complaint,

required Nirmel "to hold Confidential Information or any part thereof in trust and confidence"

and to refrain from disclosing the information except "to those who need to know, . . . with the

prior written consent of [DFO Canada]," or as "required by applicable law or legal process."

(Dkt. No. 36-1 ¶¶ 1–2.)

Incredibly, Nirmel argues that Plaintiffs have failed to specify the contract provisions and conduct at issue.[4]  Plaintiffs have in fact done so.  First, "the complaint . . . set[s] forth the terms of the agreement upon which liability is predicated" and "attach[es] a copy of the contract." *Chrysler Capital Corp. v. Hilltop Egg Farms, Inc.*, 129 A.D.2d 927, 928 (3d Dep't 1987). Second, Plaintiffs allege that Nirmel conveyed confidential information about the products in Plaintiffs' pipeline — precisely the kind of information that DFO Canada would have shared with Nirmel at the 2019 product development summit.  Plaintiffs have plausibly alleged that Nirmel disclosed information covered by the Confidentiality and Nondisclosure Agreement.  The breach of contract claim withstands Nirmel's challenge and may proceed to discovery.

### 6.   Fiduciary Breach Claims

Plaintiffs additionally claim that Nirmel breached his fiduciary duties by disclosing Plaintiffs' information while serving as CRO.  Nirmel challenges that his involvement in the misappropriation scheme is insufficiently pleaded.  For the reasons already stated, this is unpersuasive.  Nirmel alternatively argues that the fiduciary breach claim fails as duplicative of the breach of contract claim.  *See Brooks v. Key Trust Co. Nat'l Ass'n*, 26 A.D.3d 628, 630 (3d Dep't 2006) ("With regard to plaintiff's cause of action for breach of a fiduciary relationship . . .

---

[4] Nirmel makes this argument, and Plaintiffs oppose it, under New York law.  It is unclear that New York law should govern this dispute, in light of paragraph 6 of the Confidentiality and Nondisclosure Agreement, which states that the "Agreement and its validity, construction and effect shall be governed by Vietnam Laws."  (Dkt. No. 36-1 ¶ 6.)  Still, the Court entertains, and rejects, Nirmel's argument under New York law.  *See Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 860 (2d Cir. 1981) ("[T]he law of the forum may be applied here, where the parties did not . . . take the position that plaintiffs were required to prove their claims under Vietnamese law, even though the forum's choice of law rules would have called for the application of foreign law."); *see also Shtofmakher v. David*, No. 14-cv-6934, 2015 WL 5148832, at *7 n.10 (S.D.N.Y. Aug. 17, 2015) ("Defendants have provided no evidence concerning the substance of [foreign] law from which the court could conclude that Plaintiff has failed to adequately plead [the] claims.  Accordingly, the Court will apply New York law to assess the sufficiency of Plaintiff's claims."  (citations omitted)).

plaintiff's claim is based upon the same facts and theories as his breach of contract claim and was properly dismissed as duplicative." (citations omitted)).  This argument, however, is at odds with Nirmel's own interpretation of the Confidentiality and Nondisclosure Agreement: "that agreement specifically relates to information that DFO Canada provided to Nirmel in the context of his participation at the [2019 Product Development Summit]."  (Dkt. No. 43 at 25.)  Here, Plaintiffs allege that Nirmel misappropriated not only information about products in Plaintiffs' pipeline but also sales data and vendor information.  The scope of the allegedly misappropriated information exceeds that of the contract, as Nirmel reads it.  It follows that Plaintiffs' fiduciary breach claim plausibly covers more than, and thus does not duplicate, the breach of contract claim.  Nirmel presents no reason to dismiss the fiduciary breach claim.

Neither do Stevens and Hughes present a reason to dismiss Plaintiffs' claims that they aided and abetted Nirmel's fiduciary breach.  The Court has already determined that the complaint plausibly pleads Stevens's and Hughes's involvement in the misappropriation scheme.  Their remaining challenge to the aiding and abetting claim is that they were unaware of Nirmel's fiduciary duties and therefore could not have known that his misappropriation of information would constitute a breach.  Stevens and Hughes are correct that "actual knowledge of the primary violator's status as a fiduciary and actual knowledge that the primary violator's conduct contravened a fiduciary duty is required" to sustain an aiding and abetting claim, *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 624 (S.D.N.Y. 2014) (internal quotation marks and citation omitted)), but their contention that they lacked such knowledge is preposterous.  It is axiomatic that corporate officers owe fiduciary duties to their corporation.  *See Foley v. D'Agostino*, 248 N.Y.S.2d 121, 128 (1st Dep't 1964).  And it is plain that any employee funneling trade secrets to a competitor would be breaching his duties of good faith and loyalty.  *See Abraham Zion Corp.*

*v. Lebow*, 593 F. Supp. 551, 569 (S.D.N.Y. 1984) ("It cannot be disputed [] that an employee has

a fiduciary duty that exists independent of any contract between the parties to refrain from"

"misappropriat[ing] and disclos[ing] their confidential information while he [is] employed"); *see*

*also Byrne v. Barrett*, 268 N.Y. 199, 206 (1935) ("The essential point to be borne in mind is that

the duty of an agent or employee not to use confidential knowledge acquired in his employment

in competition with his principal is implicit in the relation").   Based on Nirmel's status as CRO

and the nature of the misappropriation scheme, Plaintiffs have pleaded that Stevens and Hughes

had actual knowledge that they were aiding and abetting Nirmel's fiduciary breach.   The

fiduciary breach and related aiding and abetting claims survive the motion to dismiss.

**B.      The Competing Products**

Plaintiffs' bring one final set of claims against Stevens and Hughes, in relation to their

alleged sale of products that compete with Plaintiffs' offerings.   It is with respect to these claims

— Lanham Act and unfair competition claims — that Plaintiffs' complaint is at its weakest:   The

complaint raises more questions than it answers about the ownership of the alleged marks (*see*

Dkt. No. 40 at 9 n.6, 15 n.11), and it neglects to identify — whether by name, image, or

non-conclusory description — a single product sold by Stevens and Hughes.   Recognizing the

limitations of the pleadings, Plaintiffs have voluntarily dismissed their claims as they relate to

the Mobile Klean brandname.   (Dkt. No. 48 at 9 n.6.)   Plaintiffs press just two theories of

infringement and unfair competition in their opposition to the S/H Defendants' motion to

dismiss.   *See Kid Car NY, LLC v. Kidmoto Techs. LLC*, _ F. Supp. 3d _, 2021 WL 446975, at

*13 (S.D.N.Y. 2021) ("[A] trademark infringement claim may form the basis of [an] unfair

competition claim.").   The first theory regards Stevens's and Hughes's alleged use of the Blaux

brandname in several website URLs.   The second regards Stevens's and Hughes's purchase from

Google and Facebook of the "marketing rights" to the Blaux brandname.  (Dkt. No. 36 ¶¶ 82–84;

Dkt. No. 48 at 13.)

As a threshold matter, the Court concludes that the Blaux brandname is inherently

distinctive, or "arbitrary, fanciful, or suggestive" rather than descriptive.  *Genesee Brewing Co.,*

*Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997).  Although Stevens and Hughes

dispute this issue, their grievance is with Plaintiffs' inartful pleading, not substantive deficiencies

in the content of Plaintiffs' pleadings.  Stevens and Hughes do not, after all, seriously contend

that Blaux is or sounds like an "ordinary" word that "describes a product's features, qualities or

ingredients."  *Id.* (internal quotation marks and citation omitted).  Because the Blaux brandname

is inherently distinctive, it is "automatically entitled to protection under the Lanham Act."  *Id.*

### 1.    The Blaux-Bearing URLs

Plaintiffs' theory regarding the Blaux-bearing URLs cannot sustain their trademark

infringement and unfair competition claims.  Although it is true that the use of a protected mark

in a URL can give rise to an actionable claim, *State St. Glob. Advisors Trust Co. v. Visbal*, 431 F.

Supp. 3d 322, 342 n.11 (S.D.N.Y. 2020), it is incumbent on Plaintiff to show how the use was

done "in commerce" and "is likely to cause confusion" among consumers, *1-800 Contacts, Inc.*

*v. WhenU.com, Inc.*, 414 F.3d 400, 407 (2d Cir. 2005) (internal quotation marks and citations

omitted).  Under the Lanham Act, a use "in commerce" involves the advertisement or sale of

goods or services.  15 U.S.C. § 1127.  In other words, the mark at issue must be "us[ed] as the

basis of a commercial transaction."  *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 129 (2d Cir.

2009).  After a court identifies a use in commerce, it assesses the likelihood of consumer

confusion by reference to the factors enumerated in *Polaroid Corp. v. Polarad Electronics*

*Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), including "the proximity of the products" sold by the

parties and "actual confusion" among consumers, *see TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 100 (2d Cir. 2001) (listing the *Polaroid* factors).

Plaintiffs have not plausibly pleaded that the Blaux-bearing URLs were a use in commerce. Stevens and Hughes rightfully emphasize that the complaint is bereft of allegations that the websites with Blaux in the URL sold, listed, or otherwise advertised any particular product. This omission stands in stark contrast to the complaint's explicit allegations about each of Stevens's and Hughes's other websites, such as, "The coolbreeze site offers product[s] to compete with Plaintiffs' Blaux[] portable air conditioner." (Dkt. No. 36 ¶ 101.) This pleading disparity prevents the Court from inferring what, if anything, Stevens and Hughes used the Blaux-bearing URLs to do. In turn, the Court's inability to infer that the websites sold goods or services distinguishes this case from those in which courts have treated the use of a mark in a URL as a use in commerce. *See, e.g., Visbal*, 431 F. Supp. 3d at 342 n.12 ("This constitutes a use in commerce because Plaintiffs have alleged that Defendant has used the [] mark in . . . URLs in the sale or advertising of [] replicas, which have been rendered in commerce." (internal quotation marks and citation omitted)); *New York State Soc'y of Certified Pub. Accountants v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331, 344 (S.D.N.Y. 1999) ("[T]here can be little doubt that Defendant's use of Plaintiff's mark was for commercial purposes. Defendant employed the [] domain name . . . for the purpose of attracting potential clients to its web site."); *Soter Techs., LLC v. IP Video Corp.*, _ F. Supp. 3d _, 2021 WL 744511, at *5 (S.D.N.Y. 2021) ("[The defendant's] use of the domain name . . . to redirect customer traffic to its website [where it sold competing products] constitutes a 'use in commerce").

Even if the Blaux-bearing URLs were a use in commerce, Plaintiffs' is one of the rare cases in which dismissal is warranted for failure to plead a likelihood of consumer confusion.

*See Caraway Home, Inc. v. Pattern Brands, Inc.*, No. 20-cv-10469, 2021 WL 1226156, at *10 (S.D.N.Y. Apr. 1, 2021) ("A motion to dismiss will be granted for failure to plead likelihood of confusion only if no reasonable factfinder could find a likelihood of confusion on any set of facts that plaintiff could prove." (citation omitted)).  The Second Circuit has repeatedly framed the inquiry regarding consumer confusion as whether "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the *source of the goods in question*." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978)) (emphasis added).  Moreover, numerous of the *Polaroid* factors, ranging from "the proximity of the products" to "the quality of the defendant's product," are contingent on the defendant offering goods or services that can be compared to those of the plaintiff.  *TCPIP Holding Co.*, 244 F.3d at 100.  The likelihood of confusion test may be "a fact-intensive analysis that ordinarily does not lend itself to a motion to dismiss," *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 412 (S.D.N.Y. 2006), but the Court struggles to see what confusion could befall a purchaser whose attention has been momentarily diverted to a website that is not alleged to provide either goods or services.  The "[m]ere diversion" of web traffic, "without any hint of confusion, is not enough" to sustain a trademark claim.  *Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 287 (S.D.N.Y. 2018) (quoting *Hearts on Fire Co., LLC v. Blue Nile, Inc.*, 603 F. Supp. 2d 274, 286 (D. Mass. 2009)).

### 2.      The Blaux Keyword

Plaintiffs' second theory fares better.  Plaintiffs allege that the marketing rights that Stevens and Hughes purchased from Google and Facebook directed searches for the Blaux brand to https://www.shopezcoolbreeze.com/, where Stevens and Hughes sold products that competed with the Blaux portable air conditioner.  This, on its face, pleads a use in commerce.  *See*

*Caraway Home, Inc.*, 2021 WL 1226156, at *10 ("[T]he purchase of trademarks as keywords for internet advertising qualifies as using the mark in commerce as defined in 15 U.S.C. § 1127.") Furthermore, it is at least plausible that consumers trying to buy a Blaux portable air conditioner could mistakenly purchase a competing product that they found by searching for the Blaux brand.  At the pleading stage, this suffices to preclude dismissal for lack of consumer confusion. "There is no requirement that a plaintiff address the *Polaroid* factors in its pleading."  *Eliya, Inc. v. Kohl's Dep't Stores*, No. 06-cv-195, 2006 WL 2645196, at *3 n.2 (S.D.N.Y. Sept. 13, 2006) (Lynch, J.).

Plaintiffs may pursue their Lanham Act and unfair competition claims in the limited context of Stevens's and Hughes's purchase of Blaux marketing rights from internet marketing platforms.

## IV.     Conclusion

For the foregoing reasons, Nirmel's motion to dismiss is GRANTED in part and DENIED in part, and the S/H Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Separately, Plaintiffs' motion to seal is GRANTED.

Defendants shall file their answers within 21 days after the date of this Opinion and Order.  The Clerk of Court is directed to close the motions at Docket Numbers 30, 33, 39, 42, and 50.

SO ORDERED.

Dated: August 6, 2021
New York, New York

_____
J. PAUL OETKEN
United States District Judge